**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| EMILY NANCE, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALPINE SECURITIES | : | |
| CORPORATION, | : | Civil No. 2:18-cv-00531-BSJ |
| | : | |
| Defendant. | : | Hon. Bruce S. Jenkins |

COMES NOW the Plaintiff, Emily Nance, complains of Defendant Alpine Securities Corporation, demands trial by jury and as and for causes of action alleges as follows:

## JURISDICTION

1.      This action is brought pursuant to federal question — namely, federal securities laws which require businesses in the securities industry which detect suspicious activity to report and file suspicious activity reports in an accurate and timely manner.

**PARTIES**

2.      Emily Nance (hereinafter referred to as "Ms. Nance" or "Plaintiff") is a citizen of the United States and a resident of the State of Utah.

3.      Alpine Securities Corporation (hereinafter referred to as "Alpine Securities" or "the company" or "the employer") is an employer which does business in the State of Utah in Salt Lake County and which employed Ms. Nance.

**NATURE OF CASE**

4.      On or about May 24, 2017, Alpine Securities hired Ms. Nance to work as a Compliance Analyst/Compliance Officer.

5.      Ms. Nance knew that the law required the company to prepare and file suspicious activity reports (hereinafter sometimes referred to as "SARs") within 30 days of any activity falling within the scope of the term "suspicious activity".  Her job duties involved training employees on policies and procedures and filing suspicious activity reports.  She reported to Erin Zipprich (hereinafter "Ms. Zipprich"), Compliance Officer.

6.      On one occasion, just a few days after Ms. Nance was hired, Ms. Zipprich asked Ms. Nance to take a break with her. During such break, the two walked outside the building, entered Ms. Zipprich's car, and traveled to a supervisor's home to

walk his dog.  During such break, Ms. Zipprich began to slur her speech, stumbling as if like she was going to fall down, actually fell down, and became generally incoherent.

      7.     Ms. Nance was very concerned for Ms. Zipprich and her health. At first, Ms. Nance thought Ms. Zipprich might be having a stroke and persuaded her to go to the emergency room of a local hospital.  Ms. Nance drove Ms. Zipprich to the University of Utah Emergency Room in Ms. Zipprich's vehicle.

      8.     When Ms. Zipprich presented at such hospital, the hospital ran various tests and diagnosed Ms. Zipprich as impaired due to use of marijuana (she tested positive for marijuana).

      9.     Ms. Zipprich also admitted to the physicians in Ms. Nance's presence that she had recently used cocaine.

      10.    During this hospitalization, Ms. Zipprich continued acting erratically and took off her clothes in Ms. Nance's presence, revealing her bare breasts, after Ms. Nance had asked if she could turn away to give Ms. Zipprich privacy first.

      11.    Ms. Nance waited at the hospital for Ms. Zipprich's parents to arrive. When Ms. Zipprich's parents arrived at the hospital emergency room, Ms. Nance had her mother pick her up and take her back to the office.

      12.    The next day, at work, Ms. Zipprich told Ms. Nance that she had had a "boob job", and that Ms. Nance should have a "boob job".  Ms. Zipprich also

told Ms. Nance that she could give her the name of her plastic surgeon and she pulled

up his website for Ms. Nance.

13.     After Ms. Zipprich made these unsolicited disclosures to Ms.

Nance (and Ms. Nance had indicated to Ms. Zipprich that she was uncomfortable with

Ms. Zipprich sharing such personal information with her), Ms. Zipprich became

noticeably distant in her dealings with Ms. Nance.  Ms. Zipprich would not interact

with Ms. Nance unless Ms. Nance initiated contact with Ms. Zipprich.  As a result, Ms.

Zipprich would not provide any further training to Ms. Nance unless Ms. Nance

specifically asked for Ms. Zipprich to train her on something.

14.     Ms. Zipprich seemed to resist any requests Ms. Nance made for

training. In response to such requests, Ms. Zipprich would seem preoccupied with

other matters, would be short with Ms. Nance, *i.e.,* telling her that she did not have

time to sit with her and would refer Ms. Nance to other employees in different and

unrelated departments for training.  When Ms. Zipprich would interact with Ms.

Nance, Ms. Zipprich would have Ms. Nance do menial tasks, such as copying

documents, filing documents and basic data entry (something an entry-level employee

with no experience could have done).

4

15.     As a result of Ms. Zipprich's behavior, Ms. Nance began cross-training with Becky Smith because Ms. Nance wanted to have something to do. With Ms. Smith's training, Ms. Nance caught on very quickly.

16.     Meanwhile, during the period June/early July 2017, Ms. Zipprich rarely showed up (Ms. Nance suspected (as did other employees) that Ms. Zipprich was being treated for drug and alcohol issues).

17.     As Ms. Nance learned her job and tried to do her job, she developed a good faith belief that the company had (a) not been preparing and filing suspicious activity reports on a complete and timely basis; (b) had tried to conceal delayed reporting of suspicious activities; (c) the company had altered dates on some suspicious activity reports so that it appeared that the company had prepared and filed such reports in a timely manner.

18.     As Ms. Nance reviewed more and more company records, she came to suspect that Ms. Zipprich may be the company agent likely responsible for the company's failure to comply with the obligation to prepare and file SARs on time.

19.     Ultimately, Ms. Nance decided she needed to blow the whistle on what she believed to be a serious default on the part of her supervisor, Ms. Zipprich, possibly caused by an impairment caused by drug and alcohol use, and consequential illegal activity on the part of the company in the form of failing to prepare and file

5

SARs in a timely manner and trying to cover up that failure by altering the dates of some SARs reports to make it appear as though they had been filed in a timely manner.

20.     On July 6, 2017, Ms. Zipprich was absent.

21.     Accordingly, on July 6, 2017, Ms. Nance went to her second-level supervisor, a male, and told him that she suspected that the company was not complying with the laws relating to filing SARs.

22.     Ms. Nance requested her second-level supervisor to investigate her concerns and report back to her.  Ms. Nance told her second-level supervisor that he ought to have someone who was more experienced than Ms. Nance was to investigate Ms. Nance's concerns so that the company could either confirm or otherwise address Ms. Nance's concerns.

23.     Ms. Nance also expressed to her second-levels supervisor that Ms. Nance was fearful of Ms. Zipprich retaliating against her if Ms. Zipprich were to learn that Ms. Nance had come forward, raised concerns about accurate and timely filing of suspicious activity reports and blown the whistle.  Accordingly, Ms. Nance requested that her second-levels supervisor "keep her name out of it".

24.     Ms. Nance also expressed to her second-level supervisor that she was not being trained by Ms. Zipprich, that Ms. Nance had made efforts to request such training, but that Ms. Zipprich had not been responsive and that, in the meantime,

6

Ms. Nance had been spending her time constructively, by cross-training whenever possible with Becky Smith.

25.    Ms. Nance's second-levels supervisor expressed his appreciation that she (Ms. Nance) had taken the initiative to blow the whistle and come to him.  Ms. Nance's second-level supervisor told Ms. Nance that she was doing an excellent job, that she (Ms. Nance) should keep doing what she had been doing, also that she had taken the initiative, and to cross-train.  Her second-level supervisor was enthusiastic about Ms. Nance's future with the company and openly expressed this to her.

26.    On the next day, July 7, 2017, Ms. Nance noticed that her second-levels supervisor was having a meeting with Ms. Zipprich.  Immediately after the meeting between Ms. Zipprich and the second-level supervisor ended, Ms. Zipprich contacted Ms. Nance and accused Ms. Nance of telling the second-level supervisor that Ms. Zipprich had been "doctoring documents". Ms. Nance explained that she had developed suspicions that SARs had not been prepared and submitted in a timely manner and, because of her concerns, she had approached her second-level supervisor and asked him to investigate her suspicions to determine if her suspicions were justified.

27.    About one-half hour later, Ms. Zipprich and the second-level supervisor called Ms. Nance into a meeting and told Ms. Nance that "it is not working

7

out". When Ms. Nance asked what was not working out, the two gave her subjective answers, such as Ms. Nance was not catching on, that she "did not have the spark" and that she was not "compatible, professionally".

28.     Ms. Nance explained that she had not been getting the training she needed, that she had asked for such training, but had been rebuffed by Ms. Zipprich. Then, without advance notice or without any progressive discipline and without cause, good cause or just cause, the company terminated Ms. Nance's employment.

29.     As Ms. Nance asked for some reason to justify the company's decision to terminate her employment, the second-level supervisor said that Ms. Nance was an at-will employee, that the company did not need a reason to terminate her employment or to give her any reason, and that Ms. Nance was just being confrontational.

30.     Ms. Nance alleges that the company fired her in retaliation for her blowing the whistle on what she, in good faith, believed were violations of federal law and, therefore, that the termination of her employment constitutes a wrongful termination.

31.     Ms. Nance did engage in protected activity.

32.     The timing of the termination is generally suspicious, coming one day after she blew the whistle, and the company took adverse action against her.

8

33.     Ms. Nance alleges there is a cause and effect connection between her whistleblowing and the company's decision to terminate her employment.

## FIRST CAUSE OF ACTION
## WRONGFUL TERMINATION

34.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 33 above as if alleged in full herein.

35.     The State of Utah has a clear and substantial public policy that businesses operating in the State are to comply with all state and local laws, regulations and ordinances.

36.     By blowing the whistle on the practices Ms. Nance became aware of, which she, in good faith, believed violated such clear and substantial public policies, Ms. Nance was engaging in protected activity — namely, activity protected by clear and substantial public policies.

37.     Ms. Nance alleges that, immediately after she engaged in such protected activity and because of Ms. Nance's actions in engaging in such protected activity, Alpine Securities took adverse actions against her, including terminating her employment.

38.     Ms. Nance alleges there is a direct cause-and-effect relationship between her engaging in protected activity and Alpine Securities's actions in taking adverse actions against her, in that, among other facts and factors:

a.      *There is Close Temporal Proximity Between Ms. Nance's Protected Activity and the Adverse Action the Company Took Against Her.*  Ms. Nance engaged in protected activity, and, immediately thereafter, Alpine Securities decided to take adverse action against Ms. Nance;

b.      *The is No Legitimate Business Reason for the Adverse Action.*  There was no performance-based reason for the adverse action Alpine Securities took against Ms. Nance.  Ms. Nance had been performing all of the duties of her position in a fully satisfactory, even exemplary, manner;

c.      *Failure to Comply with Company Policies and Practices Regarding Progressive Discipline and Industrial Due Process.*  Alpine Securities did not provide Ms. Nance with any of the steps of a normal, regular progressive discipline process.  It just fired her without warning and without any cause;

d.      *Failure to Given Any Reason for the Adverse Action.* Generally speaking, employers just do not fire management level employees without any reason.  Alpine Securities gave Ms. Nance no reasons whatsoever for the adverse action.  Any reasons it could have given her would have been and would be totally and unequivocally and indisputably false;

e.    *Evidence of Pretext.*  As set forth above, certain statements made by company officers and managers after the company fired Ms. Nance constituted strong evidence that the company fired Ms. Nance precisely because she had engaged in protected activity.

39.    For Alpine Securities to take such adverse action against Ms. Nance immediately following and because of Ms. Nance's actions in "blowing the whistle" on practices Ms. Nance believed to be unlawful, violates public policy.

40.    Ms. Nance alleges that, under such circumstances, such a termination constitutes a wrongful termination.

41.    Ms. Nance alleges such wrongful termination has caused her loss, injury and damages, including lost wages, lost benefits, damage to her employability, financial stress and emotional distress.

42.    As further support for such allegations, Ms. Nance, in addition to the facts alleged above, makes the following additional allegations:

43.    Other company employees had warned Ms. Nance about Ms. Zipprich, warning Ms. Nance to conduct herself in such a way that she did not get on Ms. Zipprich's "bad side".

44.    Ms. Zipprich was "tight", personally and professionally, with the third-levels supervisor, David Brent, and was "untouchable".

11

45.     The reasons the company gave for the termination of employment are false and pretextual. Ms. Nance was a good fit and was compatible professionally.

46.     On information and belief, Ms. Nance alleges that when Ms. Zipprich's defaults came to light, she may have tried to blame Ms. Nance for Ms. Zipprich's deficiencies.

47.     During the meeting to terminate Ms. Nance's employment, Ms. Zipprich threatened Ms. Nance that, if she (Ms. Nance) commented about Ms. Zipprich's erratic attendance, Ms. Zipprich could sue her, demonstrating animus toward Ms. Nance.

**PRAYER FOR RELIEF**

WHEREFORE, based on the allegations set forth herein and the evidence to be assembled, discovered, adduced, and propounded in support of these allegations, Ms. Nance respectfully requests the Court to order the following relief:

1.  For a judgment awarding her damages for lost wages and benefits, emotional distress, mental anguish, physical pain and suffering, and other damages;

2.  For attorney's fees, court costs and any other such relief as the Court deems just and equitable.

DATED this 2nd day of July, 2018.

12

    /s/ David J. Holdsworth
David J. Holdsworth
*Attorney for Plaintiff*

VERIFICATION

Emily Nance, being first duly sworn, upon hyer oath, deposes and says that she is the Plaintiff in the above-entitled action, that she has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of her own knowledge, except as to those matters alleged on information and belief which she believes to be true.


___/s/ Emily Nance_____
Emily Nancy


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 2018.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:      RESIDING AT: _____

_____